## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES OF AMERICA**

**v.**

**ANTONIO BROWN,**

    **Defendant.**

**CRIMINAL ACTION FILE NO.**

**1:20-CR-288-MHC-AJB**

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Antonio Brown's motion to suppress statements, [Doc. 26].  The Court held an evidentiary hearing, [Doc. 36 (hereinafter "T__")], after which the parties filed briefs.  [Docs. 37, 47 (corrected version) (Brown), 41 (Government)].  For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED**.

## I.    BACKGROUND

On June 29, 2020, Brown was charged via indictment with three counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts One through Three), three counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 1349 (Counts Four through Seven), one count of bank fraud in violation of 18 U.S.C. § 1344

(Count Eight), and one count of false statements on a loan application in violation of 18 U.S.C. § 1014 (Count 9).  [Doc. 1].[1]  Brown pleaded not guilty on July 31, 2020, [Doc. 4], and after several extensions, filed the currently pending motion. With briefing completed, the motion, [Doc. 26], is ripe for recommended resolution.

## II.    FACTS

The Court finds the following facts from the evidentiary hearing.  U.S. Postal Inspector ("USPI") Jacob Petronis and another postal inspector met with Brown in August 2019 at the Postal Inspection Service's Atlanta office following Brown's whistleblower report to the U.S. Attorney's Office.  T4, 44.  Petronis already had begun investigating Brown for the activity that resulted in the present charges, but Brown was not advised at the August meeting that he was under investigation.  T5, 50.   At this August session, the inspectors interviewed Brown about his whistleblower allegations.  *Id.*; Govt. Ex. 1.A.  Petronis conceded that the interview was conducted under a ruse, an interview technique about which he had received

---

[1]      The indictment also has a forfeiture provision.  [Doc. 1 at 10].

2

training.  T5-6.  Petronis described Brown's demeanor at that initial interview as calm, pleasant, cordial, and friendly.  T6.

After that interview, Petronis continued to communicate with Brown via text message.  *Id.*  On August 15, 2019, he texted Brown to set up another meeting.  T7; Govt. Ex. 2.  On August 29, 2019, during the course of texting to set up a follow-up meeting, Petronis suggested the USPI office as a meeting location, but Brown suggested his residence at Atlantic Station.  Govt. Ex. 2; T7-8, 23-24, 26.

On September 4, 2019, beginning at around 2:30 PM, Petronis and USPI Keith Speers met with Brown at his Atlantic Station apartment.  T8, 50.  The inspectors were dressed in plainclothes business attire and were carrying weapons, but the weapons were not visible under their coat jackets.  T8-9, 55.  Although the inspectors had obtained federal search warrants for Brown's residence and cell phone, at that time they did not tell him they had them nor did they execute them. T9.

Petronis surreptitiously recorded the encounter and interview with a recording device in his coat pocket. *Id.*; Govt. Ex. 1B.[2]  Brown met the agents at the door to his apartment and invited them in.  T9, 18.  Brown's assistant also was present.  The apartment contained two bedrooms, T52, and Brown used one of them as his office/showroom for merchandise that he marketed at local department stores. Govt. Ex. 1.B.1 at 02:25.  Brown and the inspectors sat in his living room, with the inspectors sitting on the couch and Brown and his assistant sat in chairs across from them.  T10, 27, 52.[3]  Brown's exit from the apartment was not blocked.  T52. Petronis confirmed with Brown that Brown's assistant understood the need for confidentiality.  T28.

_____

[2]     Petronis started recording several minutes before he entered Brown's apartment.  The Court refers to the time-stamp on the DVD admitted at the hearing. The DVD contains two separate audio recording files.  Govt. Ex. 1.B.1 (from the start of the recording to when Petronis left the apartment to telephonically speak with the Assistant U.S. Attorney), 1.B.2 (when he returned to the apartment following that conversation).  The exhibit was admitted into evidence under seal on motion of the defense.  [Doc. 42].  The Court has consulted with counsel, who agree that, although the recordings remain sealed, the Court generically may refer to Brown's whistleblowing activities while discussing those facts from the recordings that are pertinent in resolving the pending motion.

[3]     There may also have been a coffee table separating Brown and his assistant from the inspectors.  T52.

Petronis questioned Brown about Brown's whistleblower allegations. Approximately 30 minutes into the interview, Petronis asked Brown how he was "on time," and Brown responded that he was okay.  T34; Govt. Ex. 1B.1 at 30:44. He mentioned that he had an engagement to attend later, but then did not state the time of the appointment or mention it again.  T42.  Petronis stated that they wanted to discuss something personal outside of his assistant's presence.  T10, 29; Govt. Ex. 1B.1 at 31:58.  The assistant left the living room and went into the room Brown used as an office.

When Petronis began speaking about the nature of their investigation into him personally, Petronis perceived that Brown became more fidgety and he appeared more nervous.  T11, 33.  However, Brown did not appear to have any difficulty understanding the questions, he spoke and understood English, he responded to all of the questions without delay, and, at the time of their encounter, was an Atlanta City Councilman.  He did not appear to be under the influence of any substances.  *Id.*  At no time while being questioned did Brown invoke his right to counsel or his right to remain silent.  T12.  The tone of interview was non-confrontational and Brown was cooperative; the agents never raised their voices. Govt. Ex. 1.B.1.  The tone of the interview did not change even when Petronis'

5

questioning became more pointed or accusatory, *id.* at 56:25-55, 57:10, 59:40-1:00:15, T20; when Petronis described the crimes for which Brown was under investigation, *id.* at 1:01:04-:49; when Petronis described some of the evidence that had been collected during the investigation; or when Brown asked what constituted the crimes under investigation.  *Id.* at 1:02:35-1:03:08.  This portion of the interview ended at approximately 3:30 PM.  *Id.* at 1:05:00.

At that point, Petronis left the apartment for a short period of time to telephonically speak with the Assistant U.S. Attorney on the case and to make sure that the search team was ready.  *Id.*; T13, 38.  When he was alone with Brown, Speers did not threaten Brown or make any promises to him, and he did not touch him or brandish his firearm.  T56, 58.  He did not question Brown in Petronis' absence but made small talk about the apartment.  T59.  When Petronis returned to the living room, he began questioning Brown again.  The tone of the interview did not change, even though Petronis acknowledged that he was asking accusatory questions.  Govt. Ex. 1.B.2 at 01:14-05:17.

Petronis then told Brown that they had search warrants for his apartment and his phone, and gave him copies of the warrants.  *Id.* at 05:26-05:33.  Petronis asked for Brown's phone and told him that he could stay for the search of his residence

6

but that he needed to stay out of the way, or he could leave.  *Id.* at 05:41; *see also id.* at 08:28 (advising Brown that he could stay or leave but if he stayed, he'd have to remain seated).

Shortly before 4:00 PM, Speers opened the door, and other inspectors (numbering between six and eight) entered the apartment.  *Id.* at 06:04; T19, 50. The inspectors who entered the apartment did not breach the door and none were wearing raid gear such as helmets or SWAT-type uniforms, but some were wearing bulletproof vests.  T14.  Until they entered the apartment, these other officers were not visible to Brown.  T45.

Brown was told that he would get his phone back when the investigation was complete, and Petronis asked for the passcode because it would facilitate getting the phone searched and returned, to which Brown responded "Sure," and gave it to him.  T45, 51; Govt. Ex. 1.B.2 at 06:30-:34.[4]  Brown asked if they were still going forward on his whistleblower information, and Petronis responded that they still were interested in what other information he had but if the U.S. Attorney's Office

---

[4]     The phone was returned to him after Brown retained counsel.  T14-15.

did not believe he was telling the truth about his own acts, it would not be interested in his whistleblower information. *Id.* at 08:49-09:37. Petronis told him that he did not know the next stage "on this" but that he was not under arrest right now. *Id.* at 09:47-:56. After some discussions about his phone, Brown left his apartment after telling Petronis that he appreciated him. *Id.* at 15:26. Brown exited his apartment around 4:00 PM. T50.

Before Petronis advised Brown about the search warrants, Brown was not told that he was not under arrest or that he was not free to leave. At no time was he frisked, handcuffed, or otherwise restrained. T15-16, 55. He was not told in either August or September 2019 that what he stated would not be used against him. T16-17, 35. At no time during the interview was Brown advised of his *Miranda* rights. T33. Until the search began, no law enforcement officer went into any room of Brown's apartment other than the living room, and no searches were conducted before the warrants were executed. T52.

## III.   **DISCUSSION**

### A.   **ARGUMENTS**

Brown first argues that he was in custody and entitled to *Miranda* warnings because of the following facts:  the questioning took place in his small home, the

inspectors were armed and dominated the atmosphere, he was separated from his assistant (who had been in the questioning during the first 30 minutes), he was advised that his whistleblower report would only move forward if he cooperated with the investigation, and he was not told that he was not in custody or free to leave.  [Doc. 37 at 6, 9-15].  He also argues that his statements were not voluntary because they were obtained as a result of Petronis' deceit and trickery and once the subject of the questioning turned towards Brown's own activities, the tenor and tone of the interrogation changed.  [*Id.* at 15-20].

The Government counters that the totality of the circumstances shows that Brown was not in custody and not entitled to *Miranda* warnings.  It contends that the questioning was conducted in his home, which Brown selected as the loci of the interview; the interview occurred in his living room where his access to the door was unobstructed; before the interview turned to his own fraudulent activities, Brown was asked if his schedule allowed further questioning; the inspectors' firearms were not displayed; the questioning lasted only an hour and one-half; it was conducted in a conversational tone; and Brown was not touched, frisked, searched, or handcuffed.  [Doc. 41 at 9].  It claims that Brown has cited no Eleventh Circuit precedent holding that the failure to tell a suspect that he is not in custody

denotes that he is in custody, and it distinguishes the out-of-circuit cases relied upon Brown as inapposite on the facts. [*Id.* at 10-11]. If further argues that the inspectors' asking Brown's assistant to leave is far different than in the cases relied upon by Brown, such as *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), where the suspect was removed to a back storage room and his exit from that room was blocked, and *United States v. Revels*, 510 F.3d 1269 (10th Cir. 2007), where the court found that the questioning occurring in the defendant's home was not as significant as the facts that the police forcibly breached the defendant's front door, handcuffed her, and placed her prone on the floor. [Doc. 41 at 11-12]. It also argues that his statements were not rendered involuntary due to Petronis' use of a ruse. [*Id.* at 12-14].

In reply, Brown argues that he was in custody since he was not told he was free to leave and the tenor of the interview changed when the topic turned to his own conduct. [Doc. 47 at 2-4]. He argues that the Eleventh Circuit's decision in *United States v. Street*, 472 F.3d 1298 (11th Cir. 2006), supports his argument that he was in custody once the interview became accusatory. [*Id.* at 3-4 (citing *Street*, 472 F.3d at 1303-04)].

**B.    ANALYSIS**

### 1.    Brown was not in custody for purposes of *Miranda*

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). *Miranda* does not apply, however, "outside the context of the inherently coercive custodial interrogations for which it was designed." *Id.* (internal quotation marks omitted).

Notwithstanding the absence of a formal arrest, advice of *Miranda* rights is required if there is a restraint on freedom of movement "of the degree associated with a formal arrest." *Murphy*, *id.*; *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006); *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) (recognizing that an individual is considered to be "in custody" for purposes of receiving *Miranda*'s protection where "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.") (quotation marks omitted); *United*

11

*States v. Lopez-Garcia*, 565 F.3d 1306, 1316 (11th Cir. 2009) (same).  The test is objective; "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  This test "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987) (holding that courts are to consider the totality of the circumstances).  The Eleventh Circuit has explained that "although a reasonable person in the defendant's position may feel constrained not to leave . . . —and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010); *see also Street*, 472 F.3d at 1310 (contrasting custody for purposes of Fourth and Fifth Amendments and stating that "a person is in 'custody' for *Miranda* purposes only when there is a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " (quoting *Beheler*, 463 U.S. at 1125).

Several factors guide the determination of whether an environment is coercive enough to be custodial. For instance, "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the [defendant]'s home." *Brown*, 441 F.3d at 1348 (alteration and internal quotation marks omitted); *see also United States v. Deason*, 965 F.3d 1252, 1261 (11th Cir. 2020) (same); *Luna-Encinas*, 603 F.3d at 882 (same). Whether a defendant was "[u]nambiguously advis[ed] . . . that he [wa]s free to leave and [wa]s not in custody" is another "powerful factor" that "generally will lead to the conclusion that the defendant [wa]s not in custody." *Brown*, 441 F.3d at 1347. Other relevant factors include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal quotation marks omitted); *see also Brown*, 441 F.3d at 1348-49 (holding that defendant was not in custody in part because he was in a familiar setting (his girlfriend's house) and "[a]lthough an officer accompanied him throughout the house for safety reasons, he was free to eat, smoke, use the phone, and move about as he wished"). Other important factors

13

are whether the defendant was physically restrained and the duration of the interview. *See Luna-Encinas*, 603 F.3d at 881; *Brown*, 441 F.3d at 1349.[5]

In addition, the fact that an investigation has focused on a suspect does not necessarily trigger the need for *Miranda* warnings. *Phillips*, 812 F.2d at 1360. "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (emphasis added). The defendant's status as a suspect in the investigation and the "coercive environment" that exists in virtually every interview by a police officer of a crime suspect do not automatically create a

---

[5]     The Court observes that in the context of determining the voluntariness of a suspect's consent to search under the Fourth Amendment, the Eleventh Circuit has stated that no factor is dispositive. *See United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996) ("Though no factor is dispositive, a court may consider whether the individual granting consent was free to leave, whether there were coercive police procedures employed, the extent of the individual's cooperation and awareness of a right to refuse to consent, the extent of the individual's education and intelligence, and the individual's belief that no incriminating evidence would be found."), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). In the *Miranda* context, however, except for stating that "advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix," *Brown*, 441 F.3d at 1347, the Eleventh Circuit has not otherwise weighted the factors.

14

custodial situation.  *See Muegge*, 225 F.3d at 1270 (civilian employee of military appeared at interview at military investigators' offices; not custodial); *Phillips*, 812 F.2d at 1360-61 (interview of suspect by police officers in station not custodial); *see also United States v. Matcovich*, 522 Fed. Appx. 850, 851 (11th Cir. July 3, 2013) ("An interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation.") (citation and quotation marks omitted)).   While an officer's suspicions regarding a suspect " 'may bear upon the custody issue if they are conveyed' " to the suspect, " '[e]ven a clear statement from an officer that a person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.' "  *United States v. Lazarus*, 552 Fed. Appx. 892, 895 (11th Cir. Jan. 13, 2014)       (quoting        *Stanbury*, 511 U.S. at 325).   "Rather, whether the interview is custodial depends upon the totality of the circumstances, and '[t]he weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.' "  *Id.* (quoting *Stanbury*, *id.*).

The defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. *United States v. de la Fuente*, 548 F.2d 528, 533 (5ᵗʰ Cir. 1978) ("if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.")[6]; *United States v. Charles*, 738 F.2d 686, 692 (5ᵗʰ Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5ᵗʰ Cir. 1988).

Brown has not demonstrated that he was in custody. First, although Brown's initial interview in August 2019 was at the USPI office, when asked where he desired to hold the follow-up interview, Brown volunteered his residence. He greeted the inspectors at the door and invited them in. Contrary to his contention, there is no evidence that the inspectors directed him where to sit. Furthermore, there is no evidence that they restricted his movements in his apartment in anyway

---

[6]     In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11ᵗʰ Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

prior to telling him what his restrictions were if he chose to remain while they executed the search warrant.  In fact, they allowed Brown's assistant to walk unobstructed out of the living room and into the office area when she was excused just before the interview turned to Brown's own activities.  Far from the "police-dominated atmosphere" found in *Craighead* or *Revels*, Brown was not forced to go into any location other than his living room, no firearms were brandished, nor was any force or threat of force employed.  The questioning, lasting approximately an hour and a half, was not lengthy.  *Muegge*, 225 F.3d at 1269-71 (finding no custody where defendant was directed by his supervisor to speak with investigators in a secure location where he was interviewed for about two and one half hours).

Second, it is true that at no time while he was being questioned did the inspectors tell Brown that he was free to leave or not under arrest.  Brown makes much of the undersigned's statement in *United States v. Asher*, No. 1:09-CR-414-JOF-AJB, 2010 WL 4192883, at *8 (N.D. Ga. Feb. 25, 2010), *report and recommendation adopted*, No. 1:09-CR-414-WSD-AJB, 2010 WL 4237579 (N.D. Ga. Oct. 21, 2010), that "if a suspect is 'free to leave' his home to escape police inquiry, where in fact does he go?"  Initially, the Court notes that by rhetorically asking that question in *Asher*, the Court was not holding that a person

being questioned in his own home is not "free to leave" and thus in custody.  Instead, the Court there was explaining why the "free-to-leave" test was ill-fitting in such a situation (particularly in *Asher*, where the police also were contemporaneously executing a search warrant and thus had a presumptive rationale to detain him under *Michigan v. Summers*, 452 U.S. 692, 705 (1981)), and that the more accurate test was "whether here has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' "  *Asher*, 2010 WL 4192883, at *9 (quoting *Beheler*, 463 U.S. at 1125 (quotation marks omitted); *Brown*, 441 F.3d at 1347).  In any event, in *Asher*, where the Court found the defendant was *not* in custody, the police activity was so much more coercive than in this case: federal law enforcement, joined by local uniformed officers, armed with a search warrant for child pornography, showed up at Asher's home at 7:00 AM to execute the warrant.  They performed a security sweep throughout the home.  Asher was supervised by law enforcement when he went to his bedroom to get clothing (and essentially was told to hurry up), his sleeping child was rousted from her bed, Asher and his family members were accompanied by police to any room that they entered, and the driveway of the home was blocked by a police pickup truck, which vehicle

18

was visible from Asher's vantage point.  *Asher*, 2010 WL at 4192883, at \*2-3. *Asher* thus does not support Brown's contentions.

More importantly, however, even though cases point to advice that the suspect is free to leave or not under arrest as a "powerful factor" that "generally will lead to the conclusion that the defendant is not in custody," *Brown*, 441 F.3d at 1347, that in this case Brown was not so informed does not mean he was in custody.  *Dadabo v. Sec'y, Dep't of Corr.*, No. 8:15-CV-2250-T-33TGW, 2017 WL 238279, at \*10 (M.D. Fla. Jan. 19, 2017).  Just as in *Dadabo*, Brown was in the unique situation of being with at least one officer who he knew and chose to invite to his home, and who had traveled to visit him on his "home turf."  *Id.* Furthermore, in *United States v. Teers*, 591 Fed. Appx. 824, 836 (11th Cir. Dec. 2, 2014), the court rejected the defendant's his claim that he was in custody and thus entitled to receive *Miranda* warnings.  The defendant went to the IRS offices to be interviewed.  In finding that he was not in custody, the Eleventh Circuit specifically noted the agents' failure to advise him that he was free to leave or that he was not under arrest:

> In this case, the parties do not dispute that Teers was not provided *Miranda* warnings during the February and June 2005 interviews and disagree only as to whether he was in custody at the time of the interviews. We find no error in the district court's determination that

19

> Teers was not in custody at the time of the interviews.  Viewing the facts in the light most favorable to the government, the evidence showed that Teers voluntarily appeared at the IRS office for both interviews, and the IRS agents *never* brandished their weapons, physically touched or restrained Teers, *told him that he was not free to leave, or told him that he was under arrest or the subject of a criminal investigation.*  Under the totality of the circumstances, a reasonable person in Teers's position would not have believed that his freedom of movement was restrained to the degree of an arrest. . . . Furthermore, . . . Teers testified that he felt compelled to appear for the interviews, he did not feel free to leave, and the June 2005 interview had an "accusatory" tone. . . .

*Teers*, 591 Fed. Appx. at 836 (emphasis added, citations omitted).  Thus, in *Teers*, the Eleventh Circuit did not find a custodial situation even where law enforcement did not tell the suspect he was free to go or not under arrest.[7]  Therefore, Brown's argument to the contrary is without merit.

Nor is custody found by Brown's assistant being excused from the room when the questioning turned to Brown's own activities.  Brown was not coercively isolated from non-police contacts.  Petronis did not compel the assistant to leave

---

[7]    The Court recognizes that in *Teers*, the agent testified that he considered Teers a witness and not a suspect when he conducted the interview, but as noted, law enforcement's subjective intentions are irrelevant in the *Miranda* custody analysis.  *Deason*, 965 F.3d at 1259.

but rather asked Brown if the assistant could be excused, and Brown agreed. Given that Petronis suggested that the matter he wished to discuss was more private, like the defendant in *Asher*, it is apparent that Brown sought to shield her from something that was described as more private than that about which they were speaking beforehand. *See Asher*, 2010 WL at 4192883, at *10. The record also reflects that Petronis advised Brown that if he wanted to bring the assistant back into the living room after the initial discussions of the more private matter, he could. Govt. Ex. 1.B.1 at 31:58-32:15. Furthermore, as Brown tries to use to his benefit, his apartment was not so large that he was in reality isolated from his assistant, since apparently she was in an adjacent room. Also, unlike in *Craighead*, Brown was not asported into another room but instead remained in his living room the whole time.

Next, at no time during the interview did either Petronis or Speer raise their voices or ever dictate any commands that a reasonable person would conclude demanded compliance. The entire questioning, both when Brown was giving his whistleblower information and when he was being questioned about his own activities, was conducted in a conversational tone with plenty of back-and-forth between Brown and Petronis. Brown tries to inflate Petronis' testimony that Brown

21

got nervous and fidgety when the topic turned to Brown's loan applications and finances into proof that the tone of the encounter changed. But what Petronis testified to is that Brown grew more nervous. Brown's subjective beliefs are irrelevant in determining whether he was in custody. The Court has carefully listened to the interview recordings, and significantly, Petronis' tone did not change from cordial, non-confrontational, and conversational once the subject matter of the questioning switched to Brown's own activities, nor do the recordings reflect that Brown became more reticent to answer every question posed to him. Furthermore, regardless of the subject matter of the questioning, at no time did either inspector touch, frisk, search, or restrain Brown in any way. They did not display their weapons. Even when Brown was advised that his apartment and phone were going to be searched, he remained cooperative, even stating while he was leaving his own apartment before the inspectors began the search that he appreciated Petronis.

Finally, the Court rejects Brown's characterization that Petronis compelled his cooperation as a precondition of the continued investigation into the matters about which he was a whistleblower. No language or tone used by Petronis conveyed the impression that Brown had to answer questions about his own

conduct in order for the Government to continue investigating the matters as to which he was a whistleblower. Rather, Petronis made it known to Brown that in order for the U.S. Attorney's Office to consider further acting on his information, they needed to know the source of their information, i.e., whether he would make a credible witness. Having voluntarily instigated a whistleblower report, Brown was not compelled to incriminate himself in order to further cooperate. The agents did nothing to overcome Brown's free and unconstrained choice to talk. *United States v. Aquino-Bustos*, No. 1:18-CR-452-MHC-CCB, 2019 WL 7840667, at *8 (N.D. Ga. Nov. 21, 2019), *report and recommendation adopted*, No. 1:18-CR-452-MHC-CCB, 2020 WL 91500 (N.D. Ga. Jan. 7, 2020). In fact, after Brown answered all of Petronis' questions about his personal conduct, he still asked whether the whistleblower investigation would be going forward, and thus this question belies any argument that he felt compulsion or coercion to incriminate himself.

"[A] reasonable person in [Brown's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *Luna-Encinas*, 603 F.3d at 882 (quotation marks omitted). He was interviewed in his own home, a location he preferred, and

in the end, he was allowed to leave.  He was not in custody and, thus, was not entitled to *Miranda* warnings.  *See United States v. Kidd*, Criminal Case No. 1:16-CR-00172-AT-JFK, 2016 WL 10704429, at *6 (N.D. Ga. Dec. 7, 2016  (finding "[n]one of the statements made by the agents during the interview would have led Defendant, who was not physically restrained, to believe that he was in custody," where "[t]he agents did not threaten Defendant and did not refer to or brandish firearms" and "Defendant, who the court [found] voluntarily appeared for the interview, was not told that he was not free to leave but nonetheless could have left at [any time] and was advised that he would not be arrested that day and would be contacted in the future about possible charges," and he "was not arrested and, in fact, was not arrested until several months later") (citations omitted), *adopted by* 2017 WL 6520539, at *1 (N.D. Ga. Dec. 19, 2017).

Therefore, the Court concludes that Brown was not in custody for purposes of *Miranda*.

## 2.    Brown's statements were voluntary

Unlike a defendant's burden to establish being in custody, the Government bears the burden of proving that a defendant's statements were voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168

(1986); *Jackson v. Denno*, 378 U.S. 368 (1964); *United States v. Sims*, 719 F.2d 375, 378 (11ᵗʰ Cir. 1983). In determining whether Brown's statements were voluntary, the Court must assess the totality of the circumstances – both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 247 (1973); *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11ᵗʰ Cir. 2010). A defendant's statement is involuntary if the totality of the "circumstances show that 'coercive police activity' overcame the defendant's free will." *Arvelo v. Sec'y, Fla. Dep't of Corr.*, 687 Fed. Appx. 901, 904 (11ᵗʰ Cir. May 10, 2017) (quoting *Connelly*, 479 U.S. at 163-64). A non-exhaustive list of factors to be considered in assessing whether a defendant's statements are voluntary includes: the age of the accused, his level of education, his intelligence, whether the accused was advised of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226-27; *see also United States v. Ransfer*, 749 F.3d 914, 935 (11ᵗʰ Cir. 2014) (quoting *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11ᵗʰ Cir. 1996)). A determination that a defendant's statements were involuntary "must include an element of official overreaching." *Miller v. Dugger*, 838 F.2d 1530, 1536

(11th Cir. 1988).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *Id.*  The determination of whether coercive activity overcame a defendant's will "depends on a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citation omitted).   Isolated incidents of police deception, *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984); *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (misrepresentation that coconspirator confessed insufficient to make otherwise voluntary statement involuntary); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

First, the Court rejects Brown's principal argument, that his statements are involuntary because they were acquired under a ruse that the Government was interviewing him in relation to his whistleblower complaint and needed to assess his credibility.   Such deceptions do not render a confession involuntary. *See, e.g.*,

26

*Lewis v. United States*, 385 U.S. 206, 210 (1966) (holding that deceptions of law enforcement are not constitutionally prohibited); *Frazier*, 394 U.S. at 739 (holding that police misrepresentations did not render suspect's confession inadmissible); *Castaneda-Castaneda*, 729 F.2d at 1363 (police officer's use of a trick" did not "render a confession involuntary"); *see United States v. Middleton*, 245 Fed. Appx. 867, 872 (11th Cir. June 15, 2007) (noting that the "single interrogation trick" of lying about the evidence against a defendant, "in the absence of any other aggravating circumstances suggesting coercion on the part of [the police,] does not automatically render [the statement] involuntary") (citation omitted); *United States v. Grossman*, 233 Fed. Appx. 963, 967 (11th Cir. May 30, 2007) (use of a "ruse" did "not diminish the non-coercive nature of the interview"). Indeed, "[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made." *Moore v. Hopper*, 389 F. Supp. 931, 934 (M.D. Ga. 1974) (citations omitted); *see also United States v. Blue*, 122 Fed. Appx. 427, 430 (10th Cir. Feb. 11, 2005) ("Without

more, . . . misrepresentations, ruses, and trickery by questioning authorities do not render a voluntary confession involuntary.") (citations omitted).

Furthermore, Brown's statements were otherwise voluntary. Although the record is silent as to his age and educational attainment, the record does demonstrate that Brown is neither very young nor elderly. More importantly, he runs his own business that has several high-end department stores as customers/clients, and in that business employs at least one other person (his assistant). He also is an elected member of the Atlanta City Council. Therefore, the record reflects that Brown is of more than sufficient intelligence to understand his situation. Of course, he was not *Mirandized* and thus that factor weighs against a finding of voluntariness, but the voluntariness inquiry requires that the Court consider the totality of the circumstances.

Furthermore, the questioning lasted no more than 90 minutes, which courts have found not indicative of involuntariness. *United States v. Farley*, 607 F.3d 1294, 1331 (11th Cir. 2010); *cf. Shriner v. Wainwright*, 715 F.2d 1452, 1455 (11th Cir. 1983) (concluding that statements made during a five-hour interrogation were not involuntary); *see also United States v. Salman*, 286 F. Supp. 3d 1325, 1351 (M.D. Fla. 2018) (finding no coercive conduct

"notwithstanding the 5.5 hours of questioning"); *United States v. Pinder*, Criminal Action File No. 1:08-CR-421-03-MHS/AJB, 2009 WL 10670633, at *31 (N.D. Ga. Dec. 23, 2009) (finding that two hours and twenty minutes of interrogation was not coercive), *adopted by* 2010 WL 11507903, at *14 (N.D. Ga. Mar. 6, 2010). Moreover, the record demonstrates that Brown was not restrained in any manner, much less touched, and he suffered no physical punishment nor deprivation of food or sleep.

It also bears noting that before the September 4, 2019 interview and even after Inspector Petronis advised Brown that he was under investigation for bank fraud and law enforcement was going to search his residence and cell phone, Brown still was willing to talk with the Government in its investigation of the activities for which he acted as a whistleblower.  That is, Brown voluntarily approached the Government, gave it information, and was willing to continue to cooperate even after a reasonable person would recognize that the Government's interest in him was not just testimonial but also prosecutorial.  His statements therefore were voluntary.  In short, the Government has established that Brown's statements were obtained without official overreach and thus were constitutionally obtained.

As a result, the Court concludes that Brown's motion to suppress statements is due to be denied.

## IV.   **CONCLUSION**

In conclusion, for all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Defendant Antonio Brown's motion to suppress statements, [Doc. 26], be **DENIED**.

The undersigned has now ruled upon all matters referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014).  The Court has not been advised of any impediments to the scheduling of the trial as to this defendant.  Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED, RECOMMENDED, and DIRECTED**, this the 11th day of August, 2021.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE